## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JEROME JARAMILLO,**

     **Plaintiff,**

     **vs.**                                   **Civ. No. 15-920  KK**

**NANCY A. BERRYHILL,**[1]
**Acting Commissioner of Social Security,**

     **Defendant.**

### **MEMORANDUM OPINION AND ORDER**[2]

     **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 19), filed February 3, 2016, in support of Plaintiff Jerome Jaramillo's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title II disability benefits and Title XVI supplemental security income benefits.  On April 4, 2016, Plaintiff filed his Motion to Remand for Rehearing, With Supporting Memorandum ("Motion").  (Doc. 22.)  The Commissioner filed a Response in opposition on May 31, 2016 (Doc. 23), and Plaintiff filed a Reply on June 17, 2016.  (Doc. 24.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

---

[1]  Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Carolyn Colvin as the Acting Commissioner of the Social Security Administration.

[2]  Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 6, 13, 14.)

## I. Background and Procedural Record

Claimant Jerome Jaramillo ("Mr. Jaramillo") alleges that he became disabled on January 1, 2009, at the age of thirty-two because of severe chronic abdomen pain and anxiety. (Tr. 226, 230.[3])  Mr. Jaramillo completed the twelfth grade in 1994 (Tr. 230), and worked from 1995 until 2007 as an administrative assistant in a physician's office.  (Tr. 231.)

On December 14, 2010, Mr. Jaramillo protectively filed[4] applications for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 et seq. and for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq.  (Tr. 200-06, 207-08, 226.)   Mr. Jaramillo's applications were initially denied on July 11, 2011.  (Tr. 75, 76, 119-22.)  Mr. Jaramillo's applications were denied again at reconsideration on March 2, 2012.   (Tr. 78, 79, 129-31, 132-35.)   On March 26, 2012, Mr. Jaramillo requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 136-37.) The ALJ conducted a hearing on January 8, 2014.  (Tr. 39-67.)  Mr. Jaramillo appeared in person at the hearing with his attorney representative Gary Martone.  (Tr. 41.)  The ALJ took testimony from Mr. Jaramillo (Tr. 42-60) and an impartial vocational expert ("VE"), Judith Beard.  (Tr. 60-65.)

On April 2, 2014, the ALJ issued an unfavorable decision.  (Tr. 101-113.)   In arriving at his decision, the ALJ determined that Plaintiff met the insured status requirements of the Act

---

[3] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 19) that was lodged with the Court on February 3, 2016.

[4] Protective Filing Status is achieved once an individual contacts the Social Security Administration with the positive stated intent of filing for Social Security Disability benefits.  The initial contact date is considered a claimant's application date, even if it is earlier than the date on which the Social Security Administration actually receives the completed and signed application.  *See* 20 C.F.R. §§ 404.614, 404.630, 416.325, 416.340, 416.345.

through December 31, 2013,[5] and that Mr. Jaramillo had not engaged in substantial gainful activity since his alleged disability onset date.  (Tr. 103.)  The ALJ found that Mr. Jaramillo suffered from severe impairments of chronic right upper quadrant abdominal pain, an anxiety disorder, and a mood disorder.  (*Id.*)  The ALJ also determined that Mr. Jaramillo suffered from non-severe impairments related to his left small toe injury and right heel bruise.  (Tr. 103-04.)  However, the ALJ found that these impairments, individually or in combination, did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 104.)

Because he found that Mr. Jaramillo's impairments did not meet a Listing, the ALJ then went on to assess Mr. Jaramillo's residual functional capacity ("RFC").  The ALJ stated that

> [a]fter careful consideration of the entire record, I find that claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he can perform detailed but not complex instructions; can perform no more than frequent reaching or reaching overhead with his right upper extremity; and must be allowed the use of a cane with walking.

(Tr. 105.)  Based on the RFC and the testimony of the VE, the ALJ concluded that Mr. Jaramillo was not capable of performing his past relevant work, but that considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Mr. Jaramillo could perform and he was therefore not disabled.  (Tr. 111-12.)

On August 20, 2015, the Appeals Council issued its decision denying Mr. Jaramillo's request for review and upholding the ALJ's final decision.  (Tr. 1-7.)  On October 14, 2015, Mr. Jaramillo timely filed a Complaint seeking judicial review of the Commissioner's final decision.  (Doc. 1.)

---

[5] To receive benefits, Mr. Jaramillo must show he was disabled prior to his date of last insured.  *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1347 (10th Cir. 1990).

## II. <u>Standard of Review</u>

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision[6] is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence.  42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record, but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner.  *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).  In other words, the Court does not reexamine the issues *de novo*.  *Sisco v. U.S. Dep't. of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).  The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  Substantial evidence is "more than a scintilla, but less than a preponderance."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]"  *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992).  The Court's examination of the record as a whole must include "anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met."  *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence."  *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. Fed. Aviation Admin.*, 372 F.3d 1195, 1200 (10th Cir.

---

[6] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which is generally the ALJ's decision.  20 C.F.R. §§ 404.981, 416.1481.  This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision.

2004)).  Thus, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court would have "made a different choice had the matter been before it *de novo*." *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted).  As such, even if a reviewing court agrees with the Commissioner's ultimate decision to deny benefits, it cannot affirm that decision if the reasons for finding a claimant not disabled were arrived at using incorrect legal standards, or are not articulated with sufficient particularity. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). "[T]he record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence."  *Id.* at 1009-10.  Rather, the ALJ need only discuss the evidence supporting his decision, along with any "uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Id.*; *Mays v. Colvin*, 739 F.3d 569, 576 (10th Cir. 2014).

## III.  Applicable Law and Sequential Evaluation Process

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).  To qualify for disability insurance benefits, a claimant must establish a severe physical or mental

impairment expected to result in death or to last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process.  20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  At the first four steps of the evaluation process, the claimant must show that: (1) he is not engaged in "substantial gainful activity"; *and* (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) his impairment(s) meet or equal one of the Listings[7] of presumptively disabling impairments; *or* (4) he is unable to perform his "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(i-iv), 416.920(a)(4)(i-iv); *Grogan* 399 F.3d at 1261.  If the claimant can show that his impairment meets or equals a Listing at step three, the claimant is presumed disabled and the analysis stops.  If at step three, the claimant's impairment is not equivalent to a listed impairment, before moving on to step four of the analysis, the ALJ must consider all of the relevant medical and other evidence, including all of the claimant's medically determinable impairments whether "severe" or not, and determine what is the "most [the claimant] can still do" in a work setting despite his physical and mental limitations.  20 C.F.R. § 404.1545(a)(1)-(3).  This is called the claimant's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1545(a)(1) & (a)(3).  The claimant's RFC is used at step four to determine if he can perform the physical and mental demands of his past relevant work.  20 C.F.R. § 404.1520(a)(4), 404.1520(e).  If the claimant establishes that he is incapable of meeting those demands, the burden of proof then shifts to the Commissioner, at step five of the sequential evaluation process,

---

[7] 20 C.F.R. pt. 404, subpt. P. app. 1.

to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity ("RFC"), age, education, and work experience.  *Id.*, *Grogan*, 399 F.3d at 1261.

Although the claimant bears the burden of proving disability in a Social Security case, because such proceedings are nonadversarial, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised."  *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006).  "This is true despite the presence of counsel."  *Henrie*, 13 F.3d at 361.  "The duty is one of inquiry and factual development," *id.*, "to fully and fairly develop the record as to material issues."  *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997).  This may include, for example, an obligation to obtain pertinent medical records or to order a consultative examination.  *Madrid*, 447 F.3d at 791-92.  The duty is triggered by "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation."  *Hawkins*, 113 F.3d at 1167.

## IV.  Analysis

Mr. Jaramillo asserts three arguments in support of reversing and remanding his case as follows: (1) the ALJ erred by failing to properly evaluate the medical opinion evidence of treating psychologist Penny J. Davies, Ph.D.; (2) the ALJ erred by failing to properly evaluate the medical opinion evidence of State agency examining medical consultant Michael F. Gzaskow, M.D.; and (3) the ALJ failed to properly evaluate Mr. Jaramillo's credibility.  (Doc. 22 at 17-23.)  The Court finds grounds for remand as discussed below.

### A.    Medical Background Summary

#### 1.    St. Vincent Regional Medical Center

On March 14, 2008, Mr. Jaramillo experienced a sudden onset of severe right upper quadrant abdominal pain while driving his car that required him to pull over and call for assistance.  (Tr. 375-76.)   The Santa Fe Fire Department administered emergency medical services and transported Mr. Jaramillo by ambulance to the St. Vincent Emergency Department.  (Tr. 361-69, 375-76.)   There, Mr. Jaramillo underwent various labs and radiology studies for "surgical abdomen," and was ultimately treated with a "GI cocktail" after which he expressed much improvement.  (Tr. 362-63.)  Mr. Jaramillo was discharged within four hours of his arrival and reported the pain was gone.  (Tr. 362.)

#### 2.    Los Alamos Medical Center

Less than two weeks later, on March 27, 2008, Mr. Jaramillo presented to the Los Alamos Medical Center Emergency Room and complained of ongoing right upper quadrant pain.  (Tr. 328-29.)   Mateo Bosquez, M.D., conducted a surgical consultation and noted that Mr. Jaramillo had been worked up as an outpatient and emergency department patient at St. Vincent's and was thought to have gastroenteritis.  (Tr. 327-29.)   Based on Dr. Bosquez's physical exam, objective findings,[8] and Mr. Jaramillo's reported pain and family history, Dr. Bosquez assessed a "suspected acalculous cholecystitis" and performed a laparoscopic cholecystectomy.  (Tr. 328-31.)   Postoperatively Mr. Jaramillo continued to have right upper quadrant abdominal pain, and complained of anxiety attacks that exacerbated his pain.  (Tr. 327.)   Dr. Bosquez prescribed Ativan for anxiety and Percocet for pain.  (*Id*.)   Mr. Jaramillo was discharged on March 30, 2008.  (*Id*.)

---

[8] Mr. Jaramillo had an ultrasound that was reported as normal (Tr. 315); a HIDA (hepatobiliary) scan that demonstrated a "contracted gallbladder" (Tr. 317, 327); and an esophagogastroduodenoscopy that was normal (Tr. 327).

### 3. Santa Fe Pain and Spine Specialists

Less than one month later, on April 24, 2008, Mr. Jaramillo began treating with Paul S. Fullerton, D.O., of Santa Fe Pain and Spine Specialists, P.C.  (Tr. 309-10.)  At his initial visit, Mr. Jaramillo stated that his abdominal pain levels were "10 at their worst and 4 with less activity."  (*Id.*)  He described that most activities exacerbated his pain, including bending forwards and backwards, sitting, standing, walking, climbing stairs, and exercising.  (*Id.*) Dr. Fullerton performed a physical exam and assessed "thoracic dermatomal sensory radiculopathy."  (*Id.*)  Dr. Fullerton ordered an MRI of the thoracic spine, which proved to be normal, and prescribed Lyrica.  (Tr. 308, 309-10.)  Dr. Fullerton treated Mr. Jaramillo for ten months, during which he ordered blood work and a nuclear bone scan; performed an intercostal nerve block; changed his diagnosis to costochondritis; administered trigger point injections; and prescribed various medications, including Lyrica, Gabapentin, Celebrex, Flector patches, and topical nonsteroidal anti-inflammatory creams.  (Tr. 305-10.)  Mr. Jaramillo's pain persisted.  On September 26, 2008, Dr. Fullerton noted he was "running out of options" and prescribed an antidepressant and recommended acupuncture for pain management.  (Tr. 305.)  On February 26, 2009, Dr. Fullerton indicated that Mr. Jaramillo appeared to have a costochondritis affecting his chest wall that was chronic in nature.  (Tr. 304.) Dr. Fullerton re-prescribed Effexor and noted that Mr. Jaramillo would continue using topical creams.  (*Id.*)

### 4. Lyle Amer, M.D.

On April 22, 2010, Mr.  Jaramillo presented to Rheumatologist Lyle Amer, M.D. (Tr. 382.)  He reported a "2-3" year history of right upper quadrant abdominal pain that he

described at the initial visit as a "dull ache,"[9] and stated that medications had not been helpful to alleviate the pain.  (Tr. 382.)  Mr. Jaramillo treated with Dr. Amer and/or PA-C M. Gallagher-Gonzales,[10] from April 22, 2010, through February 23, 2015, and presented twenty-seven times with complaints of, *inter alia*, right upper quadrant abdominal pain.  (Tr. 10-16, 380-82, 466, 471, 482, 495-99, 526-29, 592-96, 627.)  Dr. Amer and/or PA-C Gallagher-Gonzales noted that Mr. Jaramillo's pain persisted and worsened, and they consistently assessed Mr. Jaramillo with chronic abdominal pain, fibromyalgia, muscle spasm, depression, anxiety and insomnia.  (*Id.*)  Dr. Amer and/or PA-C Gallagher-Gonzales prescribed opioid narcotic pain medications, muscle relaxants, anti-anxiety medications, antidepressants, sedatives, and compounded topical gel to treat Mr. Jaramillo's pain, anxiety, and depression.  (*Id.*)  Dr. Amer referred Mr. Jaramillo to a neurophysiologist, Dr. Wengs, who suggested Mr. Jaramillo might have a postherpetic neuralgia. (Tr. 471, 499.)  Dr. Amer also referred Mr. Jaramillo to gastroenterologist Bradley Rowberry for evaluation, who ultimately determined his pain was not a gastrointestinal problem.[11]  (Tr. 396.) On October 6, 2014, Dr. Amer prepared a "To Whom It May Concern" letter and explained that Mr. Jaramillo suffered with severe pain throughout his body from fibromyalgia, had intractable right-sided abdominal pain, and that the pain left him incapacitated.  (Tr. 32.)  Dr. Amer opined that Mr. Jaramillo was completely disabled and unable to work.  (*Id.*)

---

[9]  Mr. Jaramillo also described his pain to Dr. Amer as severe, worsening, pulsing, radiating, shooting, and interfering with his sleep.  (Tr. 12, 14, 495, 527, 528.)

[10]  PA-C M. Gallagher-Gonzales worked in Dr. Amer's practice.

[11]  Bradley B. Rowberry, M.D., performed a colonoscopy on March 17, 2011, which was remarkable for diverticulosis and a polyp.  (Tr. 396, 458.)  On April 1, 2011, Dr. Rowberry noted, however, that Mr. Jaramillo continued to have right upper quadrant pain of unclear etiology despite multiple tests.  (*Id.*)  Mr. Jaramillo saw Dr. Rowberry five more times over the next ten months.  (Tr. 453-56, 472.)  Dr. Rowberry initially assessed Mr. Jaramillo's pain as related to neuralgia, but then determined it was probably musculoskeletal and suggested physical therapy.  (*Id.*)  Dr. Rowberry prescribed Gabapentin, Lyrica, and Clonazepam.  (*Id.*)  On September 9, 2011, Dr. Rowberry ordered a repeat CT Scan, which was unremarkable.  (Tr. 425-26.)  On January 13, 2012, Dr. Rowberry suggested that Mr. Jaramillo continue his current medications, but that he should follow up with his primary care doctor because his pain was not a gastrointestinal problem.  (Tr. 472.)

### 5.   <u>Presbyterian Medical Services</u>

On December 19, 2012, Mr. Jaramillo presented to Presbyterian Medical Services ("PMS") for behavioral health care related to increased anxiety associated with his pain. (Tr. 479-81.)  Mr. Jaramillo was psychologically evaluated and began individual counseling and medication management.  (Tr. 475-78, 521-23, 523-24.)  Various PMS healthcare providers[12] regularly followed and treated Mr. Jaramillo from December 19, 2012 through April 28, 2014. (Tr. 24-27, 475-80, 511-24, 53-54, 573-87, 597-610, 628-32.)   PMS healthcare providers diagnosed Mr. Jaramillo with anxiety disorder, mood disorder, and major depression, and assessed GAF scores of 45 and 46[13] throughout most of his care and treatment.[14]  (*Id.*)  PMS healthcare providers prescribed Mirtazapine, Effexor, Amitriptyline, Hydroxyzine and Olanzapine to treat Mr. Jaramillo's mental impairments.  (*Id.*)

### 6.   <u>Penny J. Davies, Ph.D., LPCC</u>

On August 23, 2013, Mr. Jaramillo began psychological counseling with Penny J. Davies, Ph.D., LPCC, and attended forty counseling sessions with her from August 23, 2013, until February 5, 2015.[15]  (Tr. 18-22, 612-18, 624-25.)  During the course of Mr. Jaramillo's

---

[12] Mary Beth Huberman, LPCC; Susan Heumiller, LPCC; Jeri N. Rudolf, CNP; Michael Van Sice, LISW; Teisha Caldwell, LPCC; Felix C. Valencia, CSW; Loyola C. Martinez, CSW; and Frances A. Wilson, LPCC.  (Tr. 24-27, 475-80, 511-24, 53-54, 573-87, 597-610, 628-32.)

[13] The GAF is a subjective determination based on a scale of 100 to 1 of a "clinician's judgment of the individual's overall level of functioning."  *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 32.  A GAF score of 41-50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).  *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 34.

[14] Mr. Jaramillo was initially evaluated on December 19, 2012, and assessed with a GAF score of 60.  (Tr. 574.)  On January 28, 2013, he was reassessed with a GAF score of 50.  (Tr. 520.)  On February 14, 2013, Mr. Jaramillo was reassessed with a GAF score of 45 (Tr. 515), which remained constant until October 31, 2013, when he was reassessed with a GAF score of 46 (Tr. 577), which remained constant thereafter (Tr. 27, 631).

[15] Dr. Davies' notes dated February 5, 2015, are the most recent notes contained in the Transcript of the Administrative Record.

counseling, Dr. Davies prepared three "To Whom It May Concern" letters opining that Mr. Jaramillo was not able to work due to his medical issues with chronic pain and depression. (Tr. 575, 591, 623.)  On June 12, 2014, Dr. Davies completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental), and assessed that chronic pain and depression severely limited Mr. Jaramillo's everyday functioning.   (Tr. 638.)   She assessed that Mr. Jaramillo had *marked* limitations in his ability to (1) understand, remember and carry out detailed instructions; (2) maintain concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance and be punctual; (4) sustain an ordinary routine without special supervision; (5) work in coordination with or proximity to others without being unduly distracted; (6) make simple work-related decisions; (7) complete a normal workday/workweek; (8) interact appropriately with the general public or customers; (9) interact or accept instructions and respond appropriately to criticism; and (10) respond appropriately to expected or unexpected changes in the work setting.  (Tr. 638-41.)  Dr. Davies assessed that Mr. Jaramillo had *moderate* limitations in his ability to (1) remember locations and work-like procedures; (2) ask simple questions or request assistance; (3) get along with co-workers or peers; (4) travel in unfamiliar places and/or use public transportation; and (5) set realistic goals or to make plans independently of others.  (*Id*.)

### 7.   <u>State Agency Consultants</u>

Finally, State agency nonexamining and examining medical consultants evaluated Mr. Jaramillo as part of the administrative process to determine his claim.  On May 23, 2011, State Agency nonexamining medical consultant David Green, M.D., reviewed Mr. Jaramillo's medical records at the initial level of review and determined that no severe physical functionally limiting medically determinable impairment was identified, but that "[p]erhaps  there [was] some

psychiatric overlay" to Mr. Jaramillo's pain.   (Tr. 77, 431.)   On June 8, 2011, Stage agency

examining medical consultant Michael Gzaskow, M.D., diagnosed Mr. Jaramillo with "[m]ood

disorder with anxiety/depression of 60/40 due to chronic pain syndrome" and "[g]eneralized

anxiety disorder not otherwise specified (NOS) with episodic panic attacks."   (Tr. 435.)

Dr. Gzaskow  assessed that

> 1.   The claimant can relate to others but this is often compromised by his
>       chronic pain syndrome with depressive isolation withdrawal.
>
> 2.   The claimant can understand directions in a structured/supportive
>       environment but indicates he can no longer follow through due to his
>       chronic pain syndrome.
>
> 3.   He can attend to simple tasks but even then needs help from his loving
>       supportive wife (per his own history).

(Tr. 435.)   On July 8, 2011, State agency nonexamining medical consultant Jill Rowan, Ph.D.,

prepared a Psychiatric Review Technique.[16]   (Tr. 438-51.)   Therein, Dr. Rowan rated

Mr. Jaramillo's "B" criteria functional limitations as mild under Listings 12.04 *Affective*

*Disorders* and 12.06 *Anxiety Related Disorders* and indicated that Mr. Jaramillo had had no

episodes of decompensation.[17]   (Tr. 448.)   Dr. Rowan further determined that the evidence did

not establish the presence of "C" criteria under either listing.[18]   (*Id.*)   On February 24, 2012,

---

[16]   "The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the
Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and
restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of
the adult mental disorders listings.  The adjudicator must remember that the limitations identified in the "paragraph
B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at
steps 2 and 3 of the sequential evaluation process."  SSR 96-8p, 1996 WL 374184, at *4.

[17]   "B" criteria under Listings 12.04 and 12.06 are met if a claimant has at least two of the following: 1. Marked
restriction of activities of daily living; or 2. Marked difficulties in maintain social functioning; or 3. Marked
difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of
extended duration.  20 C.F.R. pt. 404, subpt. P. app. 1.

[18]   "C" criteria under Listing 12.04 are met if a claimant has a medically documented history of a chronic affective
disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work
activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the
following: 1. Repeated episodes of decompensation, each of extended duration; or 2. A residual disease process that

nonexamining medical consultant Lawrence Kuo, M.D., reviewed Mr. Jaramillo's medical records at the reconsideration level and determined that Mr. Jaramillo's medical findings remained non-severe and affirmed the prior denial.  (Tr. 85-86, 94-95.)  On March 3, 2012, nonexamining medical consultant Scott R. Walker, M.D., reviewed Mr. Jaramillo's medical records at the reconsideration level and determined that Mr. Jaramillo's psychological findings remained non-severe and affirmed the prior denial.  (Tr. 86-87, 95-96.)

### B.   Treating Physician Inquiry

An ALJ is required to conduct a two-part inquiry with regard to treating physicians, each step of which is analytically distinct.  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). First, the ALJ must decide whether a treating doctor's opinion commands controlling weight. *Krauser*, 638 F.3d at 1330.  A treating doctor's opinion must be accorded controlling weight "if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record."  *Id.* (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (applying SSR 96-2p, 1996 WL 374188, at *2[19]).   If a treating doctor's opinion does not meet this standard, the opinion is still entitled to deference to some extent as determined under the second step of the process.  *Krauser*, 638 F.3d at 1330.  In this second step, the ALJ must determine the weight to accord the treating physician by analyzing the treating doctor's opinion against the several factors provided in 20 C.F.R. §§

has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. Current history of 1 or more years' inability to function outside a highly supportive living  arrangement, with an indication of continued need for such an arrangement.  20 C.F.R. pt. 404, subpt. P. app. 1.  "C" criteria under Listing 12.06 are met if a claimant's mental impairments result in a complete inability to function independently outside the area of one's home.  *Id.*

[19] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes.  *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35*; see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

404.1527(c), 416.927(c).[20]   *Id.*   The ALJ is not required to "apply expressly" every relevant factor.  *Oldham*, 509 F.3d at 1258.  "Under the regulations, the agency rulings, and our case law, an ALJ must give good reasons . . . for the weight assigned to a treating physician's opinion," that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." *Langley*, 373 F.3d at 1119 (quoting *Watkins*, 350 F.3d at 1300).  Finally, if the ALJ rejects the opinion completely, he *must* then give "'specific, legitimate reasons'" for doing so.  *Watkins*, 350 F.3d at 1301 (citing *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996) (quoting *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987)).  "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation or lay opinion*."  *Langley*, 373 F.3d at 1121 (quoting *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (emphasis in original)).

Here, the ALJ concluded that Dr. Davies' opinion, contained in three "To Whom It May Concern" letters that Mr. Jaramillo was not able to work due to his medical issues with chronic pain and depression, was not entitled to controlling weight.  (Tr. 110.)  Instead, the ALJ accorded little weight to her opinion,[21] and stated that (1) it was not well supported by medically acceptable clinical and laboratory diagnostic techniques; (2) it was inconsistent with other substantial evidence in the case record; (3) that Dr. Davies was a psychologist and not treating Mr. Jaramillo for chronic pain; (4) that Dr. Davies' notes were sparse and primarily contained

---

[20] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist.  *See* 20 C.F.R. §§ 404.1527(c)(2)-(6) and 416.927(c)(2)-(6).

[21] *See Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (noting that according little weight to a medical opinion is effectively rejecting it).

restatements of Mr. Jaramillo's pain complaints; and (5) that the Commissioner is responsible for making decisions about whether or not a claimant is disabled.  (Tr. 110.)

Mr. Jaramillo argues that the ALJ erred in evaluating Dr. Davies' opinion because (1) the ALJ failed to cite the record in support of his findings; (2) contrary to his finding, Dr. Davies' opinion was consistent with her notes and the record as a whole; (3) the ALJ failed to consider all the regulatory factors in weighing Dr. Davies' opinion; (4) the ALJ failed to consider Dr. Davies' expertise as a psychologist; and (5) the ALJ failed to re-contact Dr. Davies to clarify the basis of her opinion.  (Doc. 22 at 17-21.)  The Commissioner disagrees and contends (1) that the ALJ's reasons for according little weight to Dr. Davies' opinion are valid; (2) that the ALJ was not required to apply every regulatory factor in weighing her opinion; and (3) that the ALJ was not required to re-contact Dr. Davies because the record was adequate for determining whether Mr. Jaramillo was disabled or not.  (Doc. 23 at 10-11.)

Dr. Davies prepared a Medical Source Statement of Ability To Do Work-Related Activities (Mental) two months after the ALJ issued his determination.   (Tr. 638-41.) Mr. Jaramillo submitted Dr. Davies' assessment of his functional limitations related to his ability to do work-related mental activities to the Appeals Council on August 7, 2014, which the Appeals Council made part of the record.  (Tr. 6, 637.)  In this post determination record, Dr. Davies assessed that chronic pain and depression severely limited Mr. Jaramillo's everyday functioning.  (Tr. 638.)  Because the Appeals Council considered this and other post decision treatment records, the Court must consider all of these records when evaluating whether the ALJ's decision is supported by substantial evidence.  *See Martinez v. Barnhart*, 444 F.3d 1201, 1208 (10th Cir. 2006).

Had Dr. Davies' entire treatment records and opinions been available to the ALJ, it is unlikely that the ALJ would have given those opinions little weight.  At step one, the ALJ stated, that Dr. Davies' opinion was not entitled to controlling weight because it was not well supported by medically acceptable clinical and laboratory diagnostic techniques and was inconsistent with other substantial evidence in the case record.  (Tr. 110.)  However, psychological opinions may rest either on observed signs and symptoms *or* on psychological tests.  *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004).  Thus, although Dr. Davies' notes do not reflect that she conducted formal psychological testing, the treatment records demonstrate that Dr. Davies treated Mr. Jaramillo weekly and/or biweekly for *seventeen months*.   More specifically, Mr. Jaramillo attended no less than 21 counseling sessions with Dr. Davies prior to rendering her opinion reflected in the mental Medical Source Statement of Ability to Do Work-Related Activities form.   The records reflect that thereafter, Mr. Jaramillo continued to be treated by Dr. Davies for more than six additional months, and she did not retract or alter her opinion based on her continued treatment and observations of him.

Additionally, far from being inconsistent with other substantial evidence in the record, Dr. Davies' opinions that Mr. Jaramillo suffered with chronic pain, anxiety and depression is *consistent* with the majority of the other substantial evidence in the case record.  (*See* Section IV.A, *supra*.)  *See* 20 C.F.R. §§ 404.1527(a)(4) and 416.927(a)(4) (generally more weight is given to opinions that are consistent with the record as whole).  The ALJ did not have the benefit of the entire record, which substantially undercuts the ALJ's decision to decline to give Dr. Davies' opinions controlling weight.

The second part of the ALJ's analysis similarly does not hold up when considering the whole administrative record.  The ALJ summarily discounted Dr. Davies' opinion stating she

was not a physician who was treating Mr. Jaramillo's chronic pain.  (Tr. 110.)  Although that statement is correct in that Dr. Davies was not medically treating Mr. Jaramillo's chronic pain, with the benefit of the entire record, it is clear to the Court that Dr. Davies' role as a psychologist was to counsel Mr. Jaramillo regarding how to psychologically manage his chronic pain and the anxiety and depression he suffered as a result.  Dr. Davies' post decision opinions reflected in the mental Medical Source Statement of Ability to Do Work-Related Activities form provided an opinion on issues related to her area of specialty; *i.e.,* psychology.  *See* 20 C.F.R. §§ 404.1527(a)(5) and 416.927(a)(5) (generally we give more weight to the opinion of a specialist about medical issues related to his or her area of specialty).

Second, the ALJ rejected Dr. Davies' opinion because he concluded that her notes primarily contained restatements of Mr. Jaramillo's pain which he found incredible.  (Tr. 110.)  Although credibility judgments are peculiarly the province of the finder of fact, such judgments by themselves "do not carry the day and override the medical opinion of a treating physician that is supported by the record."  *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)).  Here, the record supports that Dr. Davies' opinions were consistent with other substantial evidence in the case record.  (*See* Section IV.A, *supra*.)

Third, the ALJ properly noted that the Commissioner is responsible for making a decision about whether a claimant meets the statutory definition of disability.  (Tr. 110.)  However, while the Court agrees with the Commissioner that a statement by a medical source that a claimant is "disabled" or "unable to work" does not mean that a claimant will be found disabled, 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1), the ALJ's responsibility did not end there, particularly since Dr. Davies' records did not reflect a mental functional assessment.  *Robinson*, 366 F.3d at 1084

18

(finding that if evidence from a treating doctor is inadequate to determine if the claimant is disabled, an ALJ is required to recontact a medical source, including a treating physician, to determine if additional needed information is readily available).  Moreover, the State agency nonexamining medical consultants who assessed Mr. Jaramillo's mental impairments, and upon whom the ALJ relied to support his RFC and finding of nondisability (Tr. 111), did not prepare mental residual functional capacity assessments.  Dr. Rowan only prepared a PRT, which is used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process and is not an RFC assessment.  SSR 96-8p, 1996 WL 374184, at *4.  Dr. Walker merely affirmed at reconsideration the agency's initial level finding that Mr. Jaramillo's mental impairments were non-severe.  (Tr. 96.)  Thus, the Commissioner's argument that the ALJ had no duty to re-contact Dr. Davies because the existing record was sufficient for the ALJ to render a decision regarding Mr. Jaramillo's disability claim necessarily fails because the record as to Mr. Jaramillo's ability to do work-related mental activities was lacking.[22]

For the foregoing reasons, the Court finds that the ALJ's findings are not supported by substantial evidence and reversal is therefore necessary.  *Krauser*, 638 F.3d at 1330; *Hamlin*, 365 F.3d at 1214.  Although an ALJ is not required to apply expressly every relevant factor when weighing a medical opinion, *Oldham*, 509 F.3d at 1258, on remand, the ALJ should weigh Dr. Davies' opinions based on the regulatory factors.  20 C.F.R. § 404.1527(c).  For instance, the ALJ will need to consider whether the fact that Dr. Davies treated Mr. Jaramillo at *forty* appointments over a period of *seventeen months* supports according greater weight to these opinions, 20 C.F.R. §§ 404.1527(a)(2)(i) and 416.927(a)(2)(i) (generally the longer a treating

---

[22] State agency examining medical consultant Dr. Michael Gzaskow, whose opinion the ALJ accorded little weight (Tr. 110), provided a limited mental residual functional capacity assessment in which he assessed that Mr. Jaramillo was limited to simple tasks, could understand directions in a structured/supportive environment, and could relate to others except when he was compromised by chronic pain with depressive isolation/withdrawal.  (Tr. 435.)

source has treated you and the more times you have been seen, the more weight we will give to the source's medical opinion), and if the ALJ ultimately assesses little weight to Dr. Davies' opinions on remand, he will need to give reasons that are both legitimate and specific. *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003).

### C.        Credibility Findings and Analysis for Evidence of Pain

Mr. Jaramillo argues that the ALJ failed to properly evaluate Mr. Jaramillo's credibility. (Doc. 22 at 22-23.)  Specifically, he asserts that his longitudinal medical record evidences his attempts to seek medical treatment and follow that treatment once prescribed and lends support to his allegations regarding the intensity and persistence of his pain.  (*Id.*)  The Commissioner contends that the ALJ's credibility finding is supported by substantial evidence and that the Commissioner reasonably accommodated Mr. Jaramillo's pain by restricting him to a limited range of sedentary work.  (Doc. 23 at 6-9.)

The Tenth Circuit has explained the framework for the proper analysis of a claimant's evidence of pain.  "A claimant's subjective allegation of pain is not sufficient in itself to establish disability." *Thompson*, 987 F.2d at 1488 (citing *Gatson v. Bowen*, 838 F.2d 442, 447 (10th Cir. 1988)).  Instead, "[b]efore an ALJ need consider any subjective evidence of pain, the claimant must first prove by objective medical evidence the existence of a pain-producing impairment that could reasonably be expected to produce the alleged disabling pain." *Id.* (citing *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir. 1987)).  "Objective" evidence is any evidence, whether physiological or psychological, that can be discovered and substantiated by external testing. *Thompson*, 987 F.2d at 1488-89.  If a claimant does so, then the ALJ must consider whether there is a "loose nexus" between the proven impairment and the subjective complaints of pain.  *Id.*  Finally, if there is a loose nexus, the ALJ considers all of the evidence, both

objective and subjective, to determine whether the pain was disabling.  *Id.*  Even if pain is not

disabling, it is still a nonexertional impairment to be taken into consideration, unless there is

substantial evidence for the ALJ to find that the claimant's pain is insignificant."  *Thompson*, 987

F.2d at 1491.

(a)    <u>**Objective Evidence and Loose Nexus**</u>

The first step in the three-step analysis of subjective pain is to determine whether

objective medical evidence demonstrates the existence of a pain-producing impairment.

However, "[t]he absence of an objective medical basis for the degree of severity of pain may

affect the *weight* to be given to the claimant's subjective allegations of pain, but a lack of

objective corroboration of the pain's severity cannot justify disregarding those allegations."

*Thompson*, 987 F.2d at 1489 (emphasis added) (quoting *Luna*, 834 F.2d at 165).  In this case,

multiple healthcare providers noted evidence of Mr. Jaramillo's pain on physical exam.[23]  (Tr.

242-43, 297-300, 342-43.)  Additionally, on May 23, 2011, State agency nonexamining medical

consultant commented that "[p]erhaps there is some psychiatric overlay to the claimant's pain

complaints," suggesting that psychological symptoms could be causing Mr. Jaramillo's physical

pain.[24]  (Tr. 431.)    Finally, although the ALJ did not have the benefit of Dr. Amer's "To Whom

---

[23] On April 24, 2008, on physical exam, Dr. Fullerton noted that Mr. Jaramillo's pain was distributed in a T5 or T6 dermatomal pattern on the right side with some spinal tenderness in that location posteriorly.  (Tr. 310.)  On August 26, 2008, on physical exam, Dr. Fullerton noted Mr. Jaramillo had "point tenderness."  (Tr. 306.)  On April 22, 2010, Dr. Amer noted that Mr. Jaramillo was "positive for mild tenderness RUQ on palpation."  (Tr. 382.)  On June 8, 2011, Dr. Gzaskow observed that Mr. Jaramillo walked into the examining room with a very slow gait and was partially hunched over due to chronic pain.  (Tr. 433.)  On August 19, 2011, Dr. Rowberry, on physical exam, noted that Mr. Jaramillo had "tenderness over the right costal margin and just below the costal margin."  (Tr. 455.)  On October 7, 2011, Physical Therapist Christie Kelly noted that Mr. Jaramillo presented with severely limited thoracic motion in all directions and extreme point tenderness.  (Tr. 461.)  On February 28, 2013, Physical Therapist Rudy Martinez noted that Mr. Jaramillo's trunk motions were limited and protected, that his gait was limited by pain.  (Tr. 507.)

[24] On March 30, 2008, Mr. Jaramillo reported to Dr. Bosquez at Los Alamos Medical Center that his anxiety attacks exacerbated his pain.  (Tr. 327.)  Similarly, on December 19, 2012, Mr. Jaramillo reported to PMS provider Mary Beth Huberman that anxiety increased his pain and the pain, in turn, increased his anxiety.  (Tr. 479.)

21

It May Concern" letter dated October 6, 2014, Dr. Amer opined that Mr. Jaramillo suffered from severe pain throughout his body due to fibromyalgia and intractable right-sided abdominal pain. (Tr. 32.)   Thus, Mr. Jaramillo proved by objective medical evidence the existence of a pain-producing impairment as he was required to do.  *Thompson*, 987 F.2d at 1488.  As such, the ALJ was required to determine whether there was a "loose nexus" between Mr. Jaramillo's proven impairment and his subjective complaints, and then decide whether he believed him.  *Id.* at 1489.  In determining the credibility of pain testimony, the ALJ should consider such factors as

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Id.*

### (b)   Credibility Findings

Here, the ALJ recited boilerplate language that Mr. Jaramillo's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but that Mr. Jaramillo's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible.  (Tr. 106.)   The ALJ explained that Mr. Jaramillo's physical examinations were unremarkable and that numerous imaging studies had not shown any definite cause for Mr. Jaramillo's alleged pain.  (Tr. 111.)   The ALJ further explained that Mr. Jaramillo's treatment for pain had been conservative and his daily activities were fairly extensive.  (*Id*).  These findings are insufficient because the ALJ failed to consider the credibility factors outlined in *Thompson* in assessing Mr. Jaramillo's subjective complaints regarding his chronic abdominal pain.  *Thompson*, 987 F.2d at 1489.  In particular, the ALJ failed to grasp and

acknowledge the span of time over which Mr. Jaramillo complained of pain, the sheer volume of his attempts to obtain relief from pain, the frequency of his medical contacts, and the consistency of his testimony with the objective medical evidence.

For instance, the record supports that Mr. Jaramillo continuously sought care and treatment related to his chronic abdominal pain for *seven years*.[25]   (*See* Section IV.A, *supra*.) Mr. Jaramillo saw multiple healthcare providers including emergency care providers, a surgeon, a pain specialist, a rheumatologist, a neurophysiologist, a gastroenterologist, and numerous mental healthcare providers.   (*Id*.)   Mr. Jaramillo underwent several diagnostic procedures to determine the source of his physical pain including lab studies, ultrasounds, CT scans, an MRI, an esophagogastroduodenoscopy, a HIDA scan, a nuclear bone scan, and a colonoscopy.   (*Id.*) Mr. Jaramillo's diagnoses included gastroenteritis, acalculous cholecystitis, thoracic dermatomal sensory radiculopathy, costochondritis, neuralgia, musculoskeletal pain, post-herpetic neuralgia, fibromyalgia, intractable right-sided abdominal pain, anxiety disorder, mood disorder, and major depression.   (*Id*.)   Mr. Jaramillo tried various treatments to relieve his pain including a cholecystectomy, heat packs, intercostal nerve blocks, trigger point injections, acupuncture, physical therapy, and a TENS unit.  (*Id*.)  Finally, Mr. Jaramillo took an array of medications to relieve his chronic pain, anxiety and depression, including Percocet, Lyrica, Gabapentin, Celebrex, Tramadol, Lortab, Flector and/or Lidoderm Patches, Voltarem Cream, Effexor, Venlafaxine, Duloxetine, Amitriptyline, Robaxin, Tizanidine, Ativan, Clonazepam, Abilify, Mirtazapine, Lithium, Olanzapine, Temazepam, Zolpiderm, and Lunesta.   (*Id*.)   Applying the factors outlined in *Thompson,* this evidence lends support to the credibility of Mr. Jaramillo's complaints regarding the intensity, persistence, and limiting effects of his pain.

---

[25] Mr. Jaramillo first sought treatment on March 14, 2008, and the most recent medical record in the Administrative Record is dated February 23, 2015.  (Tr. 10, 361-62.)

Further, the ALJ's reliance on Mr. Jaramillo's daily activities is unpersuasive.  The ALJ stated that Mr. Jaramillo attempted in his testimony to minimize the extent of his daily activities, but that he performs a "greater range of daily activities [than he alleges], including child care, cooking, driving, and attending school basketball games."  (Tr. 109.)  However, the ALJ failed to note that Mr. Jaramillo, along with his wife and mother, reported that his family helps him with child care, that he prepares simple meals as long as his pain level permits him to do so, and that his participation with his children's school activities is limited and/or restricted depending on his pain.  (Tr. 240, 246, 250, 252, 268, 270.)  *See Krauser v. Astrue*, 638 F.3d 1324, 1333 (10th Cir. 2011) (finding that the specific facts of claimant's daily activities painted a very different picture than the generalities relied upon by the ALJ).  Moreover, an ALJ "may not rely on minimal daily activities as substantial evidence that a claimant does not suffer disabling pain."  *Thompson*, 987 F.2d at 1490.

For the foregoing reasons, the ALJ failed to apply the correct legal standard in analyzing Mr. Jaramillo's pain.  This is reversible error.  *Jensen*, 436 F.3d at 1165.

### D.    Remaining Issues

The Court will not address Mr. Jaramillo's remaining claim of error because they may be affected by the ALJ's treatment of this case on remand.  *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## V.  Conclusion

For the reasons stated above, Mr. Jaramillo's Motion to Reverse or Remand for Rehearing is **GRANTED.**

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**